## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CRYSTAL MOORE, in her individual capacity as a wrongful death heir of CLIFTON MINOR; and as the soon to be appointed administrator of THE ESTATE OF CLIFTON MINOR** | **Case No.:** |
| **Plaintiffs,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **GOLDEN OAKS HEALTHCARE, INC., d/b/a THE HEALTHCARE RESORT OF KANSAS CITY** <br> <u>Serve Registered Agent:</u> <br> Cogency Global Inc. <br> 2101 SW 21st Street <br> Topeka, KS 66604 | |
| **GATEWAY HEALTHCARE, LLC** <br> <u>Serve Registered Agent</u>: <br> Cogency Global Inc <br> 2101 S.W. 21st Street <br> Topeka, KS 66604 | |
| **ENSIGN SERVICES, INC.** <br> <u>Serve Registered Agent</u>: <br> Kimball Hansen <br> 5718 S 900 E <br> South Ogden, UT, 84405, | |
| **ENSIGN GROUP, INC** <br> <u>Serve Registered Agent</u>: <br> Cogency Global Inc <br> 850 New Burton Road Suite 201 <br> Dover, DE 19904 | |
| **Defendants.** | |

## PLAINTIFF'S COMPLAINT FOR DAMAGES

By and through undersigned counsel, Plaintiff submits this Complaint for Damages ("Complaint") against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.    Crystal Moore ("Plaintiff") is a surviving daughter of Clifton Minor.

2.    Plaintiff is and always relevant hereto, an adult over the age of 21 and a citizen of Kansas.

3.    Clifton Minor died on April 6, 2023, from an avoidable fall sustained at Golden Oaks Healthcare Inc., D/B/A The Healthcare Resort of Kansas City.



4.    Decedent Clifton Minor ("Resident") was a citizen of the state of Kansas at the time of his death.

### DEFENDANT

5.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

**GOLDEN OAKS HEALTHCARE INC., D/B/A THE HEALTHCARE RESORT OF KANSAS CITY ( "HRKC")**

6.      At all times relevant, GOLDEN OAKS HEALTHCARE INC., d/b/a THE HEALTHCARE RESORT OF KANSAS CITY ("Facility"), was a Kansas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Golden Oaks Healthcare Inc., d/b/a The Healthcare Resort of Kansas City which is a Kansas licensed nursing home located at 8900 Parallel Parkway, Kansas City, KS 66112.

7.      As such, Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

8.      Consequently, Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

9.      The sole member of GOLDEN OAKS HEALTHCARE INC., d/b/a THE HEALTHCARE RESORT OF KANSAS CITY is GATEWAY HEALTHCARE LLC.

10.     Gateway Healthcare, LLC is a foreign covered entity in Kansas.

**GATEWAY HEALTHCARE, LLC ("GH")**

11.     Gateway Healthcare, LLC is a Nevada limited liability company with its principal place of business in Nevada.

12.     The sole member of Gateway Healthcare, LLC is Ensign Group Inc.

13.     At all times relevant to this action, Defendant Gateway Healthcare, LLC. was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

Spencer Burton, President of Gateway Healthcare LLC, Ensign's Kansas-based subsidiary, added "This operation is well situated to become the operation-of-choice in its market. We are excited to work together with our healthcare partners as we strive to provide top-notch care for our patients and families we are honored to serve."

https://investor.ensigngroup.net/news/news-details/2023/The-Ensign-Group-Acquires-Skilled-Nursing-Facility-in-Kansas/default.aspx

14.     At all times relevant, Gateway Healthcare, LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

15.      Gateway Healthcare, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

   a.  Staffing budgets;

   b.  The development and implementation of nursing policies and procedures;

   c.  The hiring and firing of the Administrator; and

   d.  Training and supervising nursing staff persons.

16.     These actions and business decisions had a direct impact on the care provided to all residents including Resident.

17.     Consequently, Gateway Healthcare, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

**ENSIGN SERVICES, INC ("ESI")**

18.     Ensign Services, LLC is a Utah limited liability company.

19.     The sole member of Ensign Services, LLC is Ensign Group Inc.

20.     Ensign Group, Inc., is a citizen of Delaware making Ensign Services, LLC a citizen of Delaware.

21.    At all times relevant to this action, Defendant Ensign Services, LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

22.    At all times relevant, Ensign Services, LLC, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

23.    Ensign Services, LLC, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets;

    b.  The development and implementation of nursing policies and procedures;

    c.  The hiring and firing of the Administrator; and

    d.  Training and supervising nursing staff persons.

24.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

25.    Consequently, Ensign Services, LLC, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

## ENSIGN GROUP, INC ("EGI")

26.    EGI is a Delaware company that is incorporated in Delaware.

27.    EGI's principal place of business is California.

28.    Therefore, EGI. is a citizen of Delaware.

29.    At all times relevant to this action, Defendant EGI was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

SAN JUAN CAPISTRANO, Calif., Oct. 06, 2023 (GLOBE NEWSWIRE) -- The Ensign Group, Inc. (Nasdaq: ENSG), the parent company of the Ensign™ group of companies, which invest in and provide skilled nursing and senior living services, physical, occupational and speech therapies, other rehabilitative and healthcare services, and real estate, announced today that it acquired the operations of *Providence Place*, a 45-bed skilled nursing facility located in Kansas City, Kansas. Providence Place is located on the campus of Providence Medical Center. The acquisition was effective October 1, 2023 and will be subject to a long term, triple net lease.

**About Ensign™**

The Ensign Group, Inc.'s independent operating subsidiaries provide a broad spectrum of skilled nursing and senior living services, physical, occupational and speech therapies and other rehabilitative and healthcare services at 296 healthcare facilities in Arizona, California, Colorado, Idaho, Iowa, Kansas, Nebraska, Nevada, South Carolina, Texas, Utah, Washington and Wisconsin. More information about Ensign is available at http://www.ensigngroup.net.

https://investor.ensigngroup.net/news/news-details/2023/The-Ensign-Group-Acquires-Skilled-Nursing-Facility-in-Kansas/default.aspx

30.    At all times relevant, EGI and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

31.    EGI and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

   a.  Staffing budgets.

   b.  The development and implementation of nursing policies and procedures.

   c.  The hiring and firing of the Administrator; and

   d.  Training and supervising nursing staff persons.

32.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

33.    Consequently, EGI, owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

## JURISDICTION AND VENUE

34.     Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

35.     Defendant HRKC's sole member is Gateway Healthcare, LLC which is a Nevada Limited Liability Company.

36.     Gateway Healthcare, LLC's sole member is Ensign Group, Inc.

37.     Ensign Services, LLC's sole member is Ensign Group, Inc.

38.     Defendant EGI is a citizen of Delaware and California.

39.     Therefore, HRKC; Gateway Healthcare, LLC; EGI are citizens of Delaware and California.

40.     Plaintiff is a citizen of Kansas.

41.     All Defendants are citizens states other than Kansas.

42.     Defendants, pursuant to K.S.A. § 60-308(b)(2), purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing tortious acts within the state including, but not limited to, failing to ensure that Hospital had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

43.     Therefore, Plaintiff brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

44.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in this District of Kansas, thereby making venue proper.

## FACTUAL BACKGROUND

45.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Defendants' Treatment of Resident

46.    Resident was admitted to the Facility for skilled nursing care.

47.    Resident suffered from a broken left hip due to negligence of the Facility.

48.    Resident fell a second time due to negligence at the Facility and hit his head.

49.    Resident died because of complications due to complications of bilateral femur fractures and falls.



50.    Upon admission, Resident was or should have been identified as being at risk for falling.

51.    The Facility staff should have initiated a Care Plan to address Resident's risk for pressure injuries but did not implement the appropriate interventions.

52.    During Resident's time at the Facility, none of the Facility staff:

    a.  Properly assessed Resident's risk of falling.

    b.  Implemented or provided the appropriate interventions to prevent Resident from falling.

    c.  Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d.  Monitored Resident's condition, including Resident's injuries due to falling.

53.    At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

54.    At no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure injuries in residents like Resident.

55.    While Resident was a resident at the Facility, the Facility did not have an adequate number of staff working daily at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable fall, prevent the progression of Resident's injuries, or monitor and adequately supervise Resident's condition.

## Management of the Facility

56.    Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., control decisions including setting budgets, determining staffing levels, promulgating infection control policies, and accepting resident admissions.

57.    Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., controls the Facility by setting their staffing levels, choosing, and paying vendors including laboratories that process resident testing, and hiring and firing key personnel. As such, the Facility's administrators lack authority to make significant decisions relating to resident care.

58.    Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc.'s control over the Facility violates Kansas State regulations that vest the nursing home administrator—the individual who is on the ground in the facility, with the residents and staff—with the responsibility of managing the Facility and making decisions in the best interests of the nursing home's residents.

59.    Although Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., purports to be a mere consulting company or passive holding company, Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., had knowledge of and control over the Facility's operations.

60.    Their knowledge extended to, among other issues, staffing crises, violations of infection control protocols, and resident neglect and harm. That knowledge stemmed from multiple sources, including communication from the Facility's administrators and DONs, DOH survey deficiency citations, poor scores on federal nursing home quality measures and metrics, and the findings of the Facility's quality assurance committees.

61.    The Facility's administrators and DONs regularly communicated with Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., about day-to-day operations at the facilities, including about budget, staffing numbers, hiring, admissions, CMS Star Ratings, DOH surveys and deficiencies, and CNA documentation rates.

62.    Defendants' decision to do so leaves the employees in Facility powerless to improve patient care.

63.    Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., controls, among other things, staffing budgets, admissions, and purchasing decisions.

64.    Defendants repeatedly and persistently delegated, and continue to delegate, complete control over the Facility.  Indeed, Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., control virtually every element of the Facility's operations.

65.    The administrator at the Facility does not have control over the home's books and records; Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., , handles that exclusively.  For instance, Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., prepares the Facility's Cost Reports and quarterly and annual financial statements.

66.    Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., develops and establishes the staffing levels for each nursing discipline on each shift at the facilities through the implementation of a staffing budget. Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., then closely monitors the staffing levels to ensure that the Nursing Homes stay within the budgets that Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., set.

## Undercapitalization/Underfunding at the Facility

67.    Facility and Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

68.    Facility and Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

69.    Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

70.    No individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

71.     Transactions directed by Facility and Gateway Healthcare, LLC; Ensign Services, LLC, and the Ensign Group Inc., Left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

### LEGAL BASIS FOR GATEWAY HEALTHCARE, LLC; ENSIGN SERVICES, LLC: AND THE ENSIGN GROUP INC.'S LIABILITY

72.     Gateway Healthcare, LLC; Ensign Services, LLC; The Ensign Group Inc., are referred to herein as the "Corporate Defendants."

73.     The Corporate Defendants directed, operated, and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

74.     These policies manipulate and control the physical and financial resources and prohibit decision making at the Facility level.

75.     This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

76.     These policies and practices were developed and implemented without regard to the needs of the residents and, in fact, mandated the reckless disregard for the health and safety of the Facility's residents.

77.     The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

78.    Such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the Facility's staff.

79.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

**Direct Participation/Individual Actions**

80.    The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of nursing homes throughout the State of Kansas. One such nursing home was the Facility where Resident was admitted for care and treatment.

81.    At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

82.    At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures.  More particularly, the Corporate Defendants determined:

a.  The number of staff allowed to work in their chains of nursing homes including the Facility;

b.  The expenditures for staffing at the nursing homes including the Facility;

c.  The revenue targets for each nursing home including the Facility;

d.  The payor mix, and census targets for each nursing home including the Facility;

e.  Patient recruitment programs and discharge practices at each nursing home including the Facility.

83.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

84.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

85.    The Corporate Defendants formulated, established, and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

86.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

87. Following the mandates, the Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

88. Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

89. Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

90. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

91. At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

92. In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Kansas, and the federal government.

## Corporate Malfeasance

93.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

94.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

95.      These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and the Facility.

96.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury.  This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

97.     During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating the Facility.

98.     During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.

99.     The Corporate Defendants manage, operate, and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

100.    The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

    a.  Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Kansas and its residents;

    b.  Created the dangerous conditions described by interfering with and causing the Facility to violate Kansas statutes, laws and minimum regulations governing the operation of said nursing home;

    c.  Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management, and day to day operation of the Facility;

    d.  Caused the harm complained of herein; and

    e.  Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

## Count I - (Wrongful Death)

101.    Plaintiff, in her individual capacity, incorporates by reference the allegations previously set forth and further alleges as follows:

102.    At all times material hereto Resident was in a defenseless and dependent condition.

103.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

104.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

105.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

106.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

107.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

108.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

109.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

110.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's condition.

   b.  Failing to adequately assess Resident's risk of falling.

   c.  Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

   d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

   e.  Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding falls or fall prevention.

   f.  Failing to provide adequate assistive devices and interventions to prevent Resident's fall.

   g.  Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for falling.

   h.  Failing to provide adequate assistance and assistive devices to prevent Resident's fall.

   i.  Failing to utilize proper procedures for preventing falls.

   j.  Failing to adequately assess, monitor, ensure, and document the administration of adequate hydration to Resident;

   k.  Failing to prevent the development and worsening of Resident's injuries.

   l.  Failing to timely report Resident's changes in condition to a physician;

m. Failing to carry out the instructions of Resident's physician;

n. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falling.

o. Failing to timely transfer Resident to a Facility that could provide adequate care;

p. Failing to properly supervise and train the employees of the Defendants who were responsible for the care and treatment of Resident;

q. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's fall.

r. Failing to ensure the nursing home was properly capitalized.

s. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiffs, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

111. As a direct and proximate result of the Defendants' acts resulting in an understaffed and undercapitalized nursing home while Resident was at Facility, Resident was harmed and suffered including pain, suffering, and mental anguish, and death.

WHEREFORE, Plaintiff prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances.

**COUNT II - (Pain and Suffering by the Estate v. All Defendants)**

112. At all times material hereto Resident was in a defenseless and dependent condition.

113. As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

114. At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

115. At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

116. These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

117. These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

118. These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

119. These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

120.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

b. Failing to adequately assess Resident's risk of falling;

c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding fall prevention;

f. Failing to provide adequate assistive devices and interventions to prevent Resident's fall;

g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for falls;

h. Failing to provide adequate assistance and assistive devices to prevent Resident's falls;

i. Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

j. Failing to document the measurement of Resident's wounds adequately and concisely for proper and efficient wound treatment, management, and progression;

k. Failing to timely report Resident's changes in condition to a physician;

l. Failing to carry out the instructions of Resident's physician;

m. Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falling;

n. Failing to timely transfer Resident to a Facility that could provide adequate care;

o. Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

p. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of falls in residents like Resident;

q. Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's fall;

r. Failing to ensure the nursing home was properly capitalized.

s. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff(s), but which is verily believed and alleged will.

121.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

122.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

123.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2022, 2023, and 2024 created a high degree of probability of injury to residents and consciously disregarded the safety of all residents including Resident.

124.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

125.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

126.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

### Count III- (Alter Ego Against Defendant ENSIGN GROUP, INC.)

127.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

128.    Golden Oaks Healthcare Inc., d/b/a The Healthcare Resort of Kansas City ("Subsidiary") is so dominated by Ensign Group, Inc., that the Subsidiary is a mere instrument of Ensign Group, Inc., and are indistinct from Olden Oaks Healthcare Inc., d/b/a The Healthcare Resort of Kansas City .

129.    In fact, the Subsidiary is controlled and influenced by Ensign Group, Inc., in that Ensign Group, Inc., exercised complete control and domination over the Subsidiary finances and business practices.

130.    Specifically, Ensign Group, Inc., complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

131.    Specifically: (1) Ensign Group, Inc., own all or most of the capital stock of the Subsidiary; (2) Ensign Group, Inc., and the Subsidiary have common directors or officers; (3) Ensign Group, Inc., finance the Subsidiary; (4) Ensign Group, Inc., subscribe to all of the capital stock of the Subsidiary; (5) Ensign Group, Inc., caused the incorporation of the Subsidiary; (6) The Facility has grossly inadequate capital; (7) Ensign Group, Inc., pay the salaries and other expenses or losses of the Subsidiary; (8) Ensign Group, Inc., use the property of the Subsidiary as its own; and (9) The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from Ensign Group, Inc., in the latter's interest.

132.    Thus, Ensign Group, Inc., used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that Ensign Group, Inc.'s complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

133.    This undercapitalization and understaffing violated Olden Oaks Healthcare Inc., d/b/a The Healthcare Resort of Kansas City 's duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

134.    Ensign Group, Inc.'s public filings state that Ensign Group has assets; namely its equity interests in its operating subsidiaries including Golden Oaks Healthcare Inc.,

135.    By its own admission — in its Securities and Exchange Commission Form 10-K — Ensign Group, Inc., has assets; namely it direct and indirect equity interests in its multiple operating subsidiaries. Per Ensign Group, Inc., federal regulatory filing, Golden Oaks Healthcare Inc is an Ensign Group asset.

136.    Ensign Group, Inc., controls its subsidiary assets — including Golden Oaks Healthcare Inc —which it also calls "affiliates."

   a.    Ensign Group, Inc., defines control as the power to direct the management and policies of its affiliates.

   b.    In federal regulatory filings, Ensign Group, Inc., defines "affiliate" as "(i) any entity that, directly or indirectly through one or more intermediaries, is controlled by the Company and (ii) any entity in which the Company has a significant equity interest."

    c.   Ensign Group, Inc., has the right to as a shareholder to control the action of its subsidiaries, and its Ensign Group, Inc.'s choice whether it wants to exert control or not.

    d.   Ensign Group, Inc., makes "controlling decisions" for its wholly owned subsidiary Ensign Services, Inc., which provides services to operating subsidiaries.

    e.   The Ensign Group, Inc., Secretary testified that the "buck stop[s]" at the Ensign Group Board stating: "I mean, yeah, if you follow the chain of ownership, ultimately I suppose the buck would stop at the Ensign Group Board."

    f.   Ensign Group, Inc., completes home office cost reports for its skilled nursing facilities.  Home office cost reports are submitted to the federal government by nursing home chains that are 'controlled by one organization" according to the federal government (specifically the Centers for Medicare and Medicaid Services), a home office cost report is completed by nursing home chain operations that are "controlled" by one organization."  By completing home office cost reports for its more than 200 skilled nursing facilities – including Golden Oaks — Ensign has repeatedly confirmed its understanding that it controlled those skilled nursing facilities.

137.   Ensign Group, Inc., has employee, including its officers and directors.

These employees exercise control of affiliates including Golden Oaks.

138.   Ensign Group in regulatory filings has defined its" full-time or part time

employees" as "officers and directors who are also employees."[1]

---

[1] In determining which Eligible Persons shall receive an Award and the terms of any Award, the Committee may take into account the nature of the services rendered by the respective Eligible Persons, their present and potential contributions to the success of the Company or such other factors as the Committee, in its discretion, shall deem relevant. Notwithstanding the foregoing, an **Incentive Stock Option may only be granted to full-time or part-time employees (which term as used herein includes, without limitation, officers and Directors who are also employees**), and an Incentive Stock Option shall not be granted to an employee of an Affiliate unless such Affiliate is also a "subsidiary corporation" of the Company within the meaning of Section 424(f) of the Code or any successor provision.

139.    Administrators do not control the monies moving in and out of their skilled nursing facilities owned by the Ensign Group including the Facility here.

140.    Daily, the revenue collected by Ensign skilled nursing facilities — including the Facility here — and is taken away from the Ensign administrators and swept into a "lockbox" account controlled by Ensign Services, Inc., which is wholly owned by Ensign Group.

141.    Ensign skilled nursing facilities — including the Facility here — accounts receivable is deposited daily into a pooled lockbox account controlled by Ensign Services, Inc., (a wholly owned subsidiary of Ensign Group, Inc.)

142.    Administrators of Ensign skilled nursing facilities — including the Facility here — do not know the details of how funds are swept into a bank account controlled by Ensign Group nor do they know which account Facility income is deposited.

143.    Every day, Administrators of Ensign skilled nursing facilities — including the Facility here — lose control of their revenue, because that revenue is swept into accounts belonging to Ensign Services, Inc.; accounts the Ensign facility administrators don't control and can't control.

144.    Administrators of Ensign skilled nursing facilities — including the Facility here — cannot withdraw money from or write checks off their facility bank accounts.

145.    Chad Keetch — an Ensign Group Executive — testified that administrators "can't jut, you know, go to the bank and withdraw money."

146.    Here, the administrator is not authorized to write checks and is not authorized to make any withdrawals from the bank account where Medicare and Medicaid receivables are deposited.

147.    Because Administrators of Ensign skilled nursing facilities — including the Facility here — aren't authorized to withdraw money from facility bank accounts the administrator lacks the ultimate authority to control their facilities.

148.    A revolving credit agreement guaranteed by Ensign Group restricts actions of its subsidiary skilled nursing facilities like Golden Oaks.

149.    The existence of a revolving credit agreement (also known as a credit facility or revolver) guaranteed by Ensign Group, Inc.

150.    Per SEC filings this twice amended credit facility restricted the actions of skilled nursing facility affiliates like Golden Oaks including but not limited to incurring indebtedness, granting liens, selling assets, making investments, and engaging in acquisition, merger, or consolidations.

151.    Administrators of Ensign skilled nursing facilities — including the Facility here — did not have the authority to enter into loans or establish revolving credit agreement because the authority to do so resides with Ensign Group, Inc.

152.    When the action of Administrators of Ensign skilled nursing facilities — including the Facility here — is restricted by third parties (i.e., Ensign Group Inc., and lenders), then the Ensign administrator lack ultimate authority over and control of their facilities' operations

153.    Ensign skilled nursing facilities — including the Facility here — expenses are paid from a fund that pools money from hundreds of Ensign owned skilled nursing facilities.

154.    The funds used to pay expenses for facilities — including the Facility here — lacking funds are classified as "interest free" loans.

155.    In other words, the use of pooled funds to pay expenses for facilities — including the Facility here — and even to issue interest-free loans to fellow facilities establishes that Ensign administrators do not control the monies used to fuel their individual facility operations.

156.    Meaning, Ensign administrators— including the Facility here — tap into a pool of money that flows from more than 200 **other** facilities.

157.    No single Ensign administrator — including the Facility here — including the Golden Oaks administrator — controls that pool of money.

158.    Ensign Group, Inc., controls the following additional operational aspects of its subsidiary skilled nursing facilities, including Golden Oaks:

159.    Ensign skilled nursing facility administrators — including the Facility here — are hired on the authority of the Ensign Group, Inc., CEO and are supervised by persons who work for entities controlled by the Ensign Group, Inc., Ensign administrators are hired on the authority of the Ensign Group Chief Executive Officer

160.    The CFO of the Ensign Group, Inc., is then CFO for each Ensign skilled nursing facility.

161. Ensign Group is fully liable for all financial and legal aspects of employee benefit plans.

162. Employees of Ensign skilled nursing facilities are required to familiarize themselves with the Ensign Group, Inc., Code of Conduct.

163. Ensign skilled nursing facilities— including the Facility here — obtain professional liability insurance from an entity wholly owned by Ensign Group, Inc.,

164. Ensign skilled nursing facilities— including the Facility here — do not have the authority to obtain their own professional liability insurance.

165. Ensign skilled nursing administrators — including the Facility here — do not have the authority to select legal representation for legal claims made against their facilities. The Ensign Group, Inc., General Counsel oversees litigation and litigation management services and informs the Ensign Group, Inc., Board about legal claims.  Legal claims for Ensign affiliated skilled nursing facilities— including the Facility here — are overseen by Beverly Wittekind, General Counsel of The Ensign Group. Ms. Wittekind informs The Ensign Group Board regarding claims every quarter.

166. As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and Ensign Group, Inc., – Resident was harmed and suffered non-economic damages including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

167.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and Ensign Group, Inc., – Plaintiffs, suffered non-economic damages including loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

## COUNT IV - (Negligence by the Estate v. All Defendants)

168.    At all times material hereto Resident was in a defenseless and dependent condition.

169.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

170.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

171.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

172.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

173.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

174.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

175.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

176.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

b. Failing to adequately assess Resident's risk of falling;

c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

e. Failing to have enough staff at the Facility to ensure Resident's needs were being met regarding fall prevention;

f.   Failing to provide adequate assistive devices and interventions to prevent Resident's fall;

g.   Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for falls;

h.   Failing to provide adequate assistance and assistive devices to prevent Resident's falls;

i.   Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

j.   Failing to document the measurement of Resident's wounds adequately and concisely for proper and efficient wound treatment, management, and progression;

k.   Failing to timely report Resident's changes in condition to a physician;

l.   Failing to carry out the instructions of Resident's physician;

m.   Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falling;

n.   Failing to timely transfer Resident to a Facility that could provide adequate care;

o.   Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

p.   Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of falls in residents like Resident;

q.   Failing to carry out and follow standing orders, instructions, and protocol regarding the prevention of Resident's fall;

r.   Failing to ensure the nursing home was properly capitalized.

s.   Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff(s), but which is verily believed and alleged will.

177.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

178.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

179.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2022, 2023, and 2024 created a high degree of probability of injury to residents and consciously disregarded the safety of all residents including Resident.

180.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

181.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

182.   The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages and past medical expenses.

## PLAINTIFF's DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE

Respectfully Submitted,

STEELE LAW FIRM, LLC

By:  */s/ Jonathan Steele*

Jonathan Steele KS # 24852
Dusty Gleason KS# 79191
2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
dusty@nursinghomeabuselaw.com
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on February 24, 2025 a copy of the above and foregoing was forwarded for service to a Court appointed process server.

*/s/ Jonathan Steele*

Attorney for Plaintiff(s)